2023R00771/mjb

RECEIVED
MAY 21 2026
AT 8:30 M
CLERK, U.S. DISTRICT COURT - DNJ

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Hon. Robert Kirsch |
| | : | |
| v. | : | Crim. No. 26- 177 |
| | : | |
| MORDICHAI WEISS | : | 18 U.S.C. § 1349 |

# I N F O R M A T I O N

The defendant having waived in open court prosecution by Indictment, the United States charges:

## Background and Relevant Parties

1. At all times relevant to this Information:

a. The defendant, MORDICHAI WEISS ("WEISS"), was a resident of Monsey, New York. Between at least April 2022 and June 2023, WEISS purported to be a real estate investor.

b. Individual-1 was WEISS's spouse, and resided with WEISS in Monsey, New York.

c. 75 Prospect Street ("75 Prospect') was an apartment complex in East Orange, New Jersey. 75 Prospect was purchased in or around April 2022 by WEISS and/or his co-conspirators.

d. 46 Dodge Street ("Rochester Commons") was an apartment complex in Rochester, New York. Rochester Commons was purchased in or around October 2022 by WEISS and/or his co-conspirators.

e. 8150 Lakecrest Drive ("Lakecrest Drive") was an apartment complex in Greenbelt, Maryland. Lakecrest Drive was purchased in or around December 2022 by WEISS and/or his co-conspirators.

f. 82-84 Wadsworth Avenue ("82 Wadsworth") was an apartment complex in New York, New York. 82 Wadsworth was purchased in or around December 2022 by WEISS and/or his co-conspirators.

g. 49 Prospect Street, 444 Prospect Street, 161 North Arlington Avenue, and 356 Williams Street ("East Orange Portfolio") were a group of four apartment complexes in East Orange, New Jersey. The East Orange Portfolio was purchased in or around February 2023 by WEISS and/or his co-conspirators.

h. 800 South 4th Street ("800 Tower") was an apartment complex in Louisville, Kentucky. 800 Tower was purchased in or around May 2023 by WEISS and/or his co-conspirators.

i. 1200 Holden Avenue ("1200 Holden") was an apartment complex in Orlando, Florida. 1200 Holden was purchased in or around June 2023 by WEISS and/or his co-conspirators.

j. 7110 Ardmore Street ("Virtuo Med") was an apartment complex in Houston, Texas. Virtuo Med was purchased in or around June 2023 by WEISS and/or his co-conspirators.

k. Victim Lender-1 and Victim Lender-2 were two government-sponsored enterprises ("GSEs") formed by the United States Congress. Among other purposes, Congress formed Victim Lenders-1 and -2 to purchase mortgages, including for multi-family properties, to increase the amount of money available in the mortgage lending market. Victim Lenders-1 and -2 worked with certain approved financial institutions that issued loans, sold loans to the GSEs, and serviced loans on behalf of the GSEs.

l. Financial Institution-1 was a commercial real estate financing company with its U.S. headquarters in New York, New York. Financial Institution-1 was a financial institution as defined by 18 U.S.C. § 20 and was approved to sell and service loans on behalf of the GSEs.

m. Financial Institution-2 was a commercial real estate financing company with its U.S. headquarters in Chicago, Illinois. Financial Institution-2 was a financial institution as defined by 18 U.S.C. § 20 and was approved to sell and service loans on behalf of the GSEs.

n. Financial Institution-3 was a commercial real estate financing company with its U.S. headquarters in Bethesda, Maryland. Financial Institution-3 also was a financial institution as defined by 18 U.S.C. § 20 and was approved to sell and service loans on behalf of the GSEs.

o. Financial Institution-4 was a commercial real estate financing company with its U.S. headquarters in New York, New York. Financial Institution-4 also was a financial institution as defined by 18 U.S.C. § 20 and was approved to sell and service loans on behalf of the GSEs.

p. Title Company-1 was a title and settlement company with its principal place of business in Howell, New Jersey, and served as closing or settlement agent for 800 Tower, East Orange Portfolio, Virtuo Med, and 1200 Holden.

q. Unindicted Coconspirator-1 was an employee of Title Company 1.

r. Unindicted Coconspirator-2 was an employee of Title Company-1.

s. Title Company-2 was a title and settlement company with its principal place of business in Lakewood, New Jersey, and served as closing or settlement agent for 75 Prospect and Lakecrest Drive.

t. Title Company-3 was a title and settlement company with its principal place of business in Rosedale, New York, and served as closing or settlement agent for 82 Wadsworth and Rochester Commons.

## Commercial Property Mortgage Lending Process

2. A Purchase and Sale Agreement ("PSA") was a document that was written and signed after a buyer and seller mutually agreed on the price and terms of a real estate transaction.

3. A Letter of Intent ("LOI") was a document that outlined the terms of a potential sale of a property and served as an "agreement to agree" between two parties.

4. A Proof of Funds ("POF") was a document, such as a bank statement, that provided proof that an individual or entity had the financial means to complete a transaction.

5. When a real estate developer or "sponsor" identified a commercial property they were interested in purchasing, the sponsor or their broker typically reached out to the current owner and sent a LOI outlining their interest in the property, potential sales price, and sponsor due diligence. If the current owner (*i.e.*, the seller) agreed to the terms, the sponsor and seller entered into a PSA outlining in greater detail the specifics of the sale transaction.

6. Around the same time of the LOI or PSA, the sponsor typically sought financing for the transaction. Financing a commercial property generally involved loans with seven- to ten-year terms, with balloon payments at the end of the term. At the expiration of a term, when the balloon payment was due, borrowers often re-financed the loan to satisfy the balloon payment and any other outstanding debts. Lenders generally loaned up to approximately eighty percent of the value of the property. Lenders typically required a borrower to fund the remaining twenty percent equity requirement with cash, so the sponsor had a financial stake in the property's future value and performance.

7. Financial institutions that were considering issuing a loan on a commercial property evaluated several factors to determine whether to make the loan, including, among other considerations, the value of the property. To determine the value of the property, the lender typically hired an appraiser.

8. Appraisers assumed the PSA was an arm's length transaction, a transaction where the buyer of a property did not have a preexisting familial or business relationship with the seller. Typically, an appraiser valued the property at or close to the purchase amount in the PSA.

9. If a lender agrees to make a loan, closing is the final step in the mortgage loan production process. It is the legal execution or closing of the loan. At the time of loan closing, title passes from the seller to the buyer/borrower. Passing the title requires payment for the property (that is, consideration), which comes from the funds the buyer borrows plus the down payment. The goal of closing is to disburse funds to all appropriate parties, ensure the legal transfer of title and recording of liens, and ensure compliance with all mortgage lender, insurance, and inspection requirements. Closing is of particular importance to the mortgage lender because the process results in a first lien on the property and an enforceable debt. The closing provides the mortgage lender with the right to expect repayment of the borrowed funds and recourse should the borrower fail to do so.

10. A settlement statement was a standard form used by title companies in real estate closings or settlements to itemize all the fees and charges that both the buyer and seller must pay during the settlement process of a real estate transaction. There was an acknowledgement signed by both the borrower and seller at the bottom of each settlement statement that each had received a copy of the settlement statement and that each authorized the title company to cause the funds to be disbursed in accordance with this agreement. The settlement statement provided written instructions to the settlement agent or escrow officer on how to disburse the funds for the transaction.

**The Conspiracy**

11. From at least as early as in or around April 2022 through in or around June 2023, in the District of New Jersey, and elsewhere, the defendant,

MORDICHAI WEISS,

knowingly and intentionally conspired with others known and unknown to devise a scheme and artifice to defraud Financial Institutions-1, -2, -3, and -4 and Lenders-1 and -2 and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, and to transmit and cause to be transmitted by means of wire communications in interstate and foreign commerce, certain writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice to defraud, contrary to Title 18, United States Code, Section 1343.

**Goal of the Conspiracy**

12. The goal of the conspiracy was for defendant WEISS and his co-conspirators to enrich themselves by inducing financial institutions and lenders to issue commercial mortgage loans in amounts greater than the properties would have otherwise qualified for based upon materially false pretenses, representations, and promises regarding the inflated value of the properties made by WEISS and his co-conspirators.

**Manner and Means of the Conspiracy**

13. It was a part of the conspiracy that from in and around April 2022 through in and around June 2023, WEISS, Individual-1, and others, bought, or used a related party to purchase, certain properties at market value.

14. It was part of the conspiracy that in connection with the purchases, WEISS and his co-conspirators made various misrepresentations and material omissions, including submitting documentation reflecting a false and grossly inflated purchase price to the respective financial institutions and/or lenders in order to obtain financing based on that inflated price, in amounts greater than they would have otherwise been qualified to receive.

15. It was part of the conspiracy that after obtaining the loan proceeds under false pretenses, WEISS and his co-conspirators moved the funds through their bank accounts for their own financial enrichment.

**Acts in Furtherance of the Conspiracy**

16. In furtherance of the conspiracy and in order to effect the object thereof, its members, including WEISS, committed the following acts, among others, in the District of New Jersey and elsewhere:

***Virtuo Med***

17. In or around February 2023, WEISS and his representatives contacted Individual-2, the broker representing the then-owner of Virtuo Med (Seller-1), to express WEISS's interest in the potential purchase of Virtuo Med.

18. On or about February 20, 2023, WEISS prepared a LOI on behalf of Weiss Property Group LLC for the purchase of Virtuo Med. The LOI reflected an offer to purchase Virtuo Med for $67,156,000 with $3,000,000 in "hard" money.

19. On or about February 21, 2023, Individual-2 sent an email to WEISS, writing: "Can we get POF and a list of properties owned or a website?" WEISS responded to the email with an attachment. The attachment included a

screenshot of a purported business checking account belonging to WEISS and reflecting a balance of approximately $44,910,959.45, as of February 3, 2023. In fact, this screenshot was fabricated and did not accurately reflect WEISS's available funds. Instead, the account depicted in the screenshot was a personal checking account belonging to WEISS that was closed out on or about November 2, 2022, and had a final balance of approximately $379.66.

20. Between March and May 2023, WEISS, by Virtuo Med Center Apts LLC, entered into a series of agreements with Seller-1 regarding the purchase of Virtuo Med. On or about May 11, 2023, the parties entered into a final agreement whereby WEISS agreed to purchase Virtuo Med from Seller-1 for $66,906,000.

21. In or around May 2023, WEISS sought financing from Financial Institution-4 to fund his purchase of Virtuo Med. In order to obtain such funding, Title Company-1, on behalf of WEISS, was required to provide Financial Institution-4 a copy of the final settlement statement.

22. Title Company-1, however, never provided Financial Institution-4 with a copy of the legitimate settlement statement that was approved and finalized by both parties to the Virtuo Med transaction. Rather, Title Company-1 provided Financial Institution-4 with a falsified settlement statement that reported the purchase price of the Virtuo Med property as $97,800,000—over $30,000,000 more than the *bona fide* transaction price. Title Company-1 further represented that WEISS intended to pay approximately $29,300,000 at the time of closing. This too was false. In reliance on the information listed in the fraudulent settlement statement provided by Title Company-1, Financial

Institution-4 agreed to lend WEISS $68,460,000 to fund his purchase of Virtuo Med. This sum represented 80% of the falsified purchase price presented to Financial Institution-4.

23. On or about June 13, 2023, and in reliance on the information listed in the fraudulent settlement statement provided by Title Company-1, Financial Institution-4 extended WEISS $68,460,000 in financing to purchase Virtuo Med. The terms of this loan included the understanding that Lender-2 would subsequently purchase the loan from Financial Institution-4.

24. On or about that same day, June 13, 2023, WEISS's purchase of Virtuo Med closed for a final transaction price of $66,906,000.

25. On or about June 14, 2023, a day after the closing, representatives of Financial Institution-4 identified certain errors on the Virtuo Med settlement statement provided by Title Company-1. This resulted in a series of emails between representatives of Financial Institution-4 and Unindicted Coconspirators-1 and -2, as follows:

a. At 3:07 p.m., Unindicted Coconspirator-2 sent Financial Institution-4 an email with a settlement statement identified as "final version signed and used" which listed the purchase price at $66,906,000. This settlement statement accurately reflected the price at which WEISS purchased Virtuo Med.

b. At 3:10 p.m., Unindicted Coconspirator-2 sent Financial Institution-4 an email, which stated, "Plase [*sic*] sorry I am crossing my files, please disregard will send shortly."

c. At 3:13 p.m., Unindicted Coconspirator-1 sent Financial Institution-4 an email with a different version of the settlement statement, which instead listed the $97,800,000 purchase price. This settlement statement misrepresented the *bona fide* price that WEISS paid for Virtuo Med.

d. At 3:20 p.m., Unindicted Coconspirator-1 sent Financial Institution-4 an email, which stated, "it didn't attached [sic] the fully signed with buyer's name and settlement signed." This email attached a third version of the settlement statement referencing a purchase price of $97,800,000, a loan amount of $68,460,000, and approximately $29,000,000 due from the borrower at the time of closing. The buyer and seller were incorrectly named, with "Mordechai Weiss, Managing Member" (WEISS's first name was misspelled) listed below the signature. This settlement statement too misrepresented the *bona fide* price that WEISS paid for Virtuo Med.

26. In addition to the fraudulent loan obtained from Financial Institution-4 in connection with the purchase of Virtuo Med, WEISS and/or his co-conspirators fraudulently secured seven additional commercial mortgage loans from Financial Institutions-1, -2, and -3, and Lenders-1 and -2, to purchase ten other properties. Each of these fraudulent WEISS loans are summarized in the table below:

| Property | Financial Institution | Sale Price (Actual) | Sale Price (As represented to Financial Institution) | Loan Amount |
|---|---|---|---|---|
| Virtuo Med | Financial Institution-4 | $ 66,906,000 | $ 97,800,000 | $ 68,460,000 |
| 75 Prospect | Financial Institution-3 | $ 13,100,000 | $ 19,200,000 | $ 13,302,000 |
| Rochester Commons | Financial Institution-3 | $ 12,650,000 | $ 15,576,000 | $ 12,309,000 |
| Lakecrest Drive | Financial Institution-3 | $ 33,500,000 | $ 44,500,000 | $ 34,824,000 |
| East Orange Portfolio | Financial Institution-2 | $ 16,800,000 | $ 33,000,000 | $ 25,152,000 |
| 82 Wadsworth | Financial Institution-2 | $ 7,050,000 | $ 15,500,000 | $ 11,933,000 |
| 800 Tower | Financial Institution-1 | $ 41,250,000 | $ 65,494,000 | $ 42,257,000 |
| 1200 Holden | Financial Institution-2 | $ 20,345,000 | $ 32,900,000 | $ 21,329,000 |
| **TOTAL** | | **$ 211,601,000** | **$323,970,000** | **$229,566,000** |

In violation of Title 18, United States Code, Section 1349.

**FORFEITURE ALLEGATION**

27. Upon conviction of the conspiracy charged in this Information, the defendant,

MORDICHAI WEISS,

shall forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461, any property, real or personal, which constitutes or is derived from proceeds traceable to the commission of such conspiracy.

**SUBSTITUTE ASSETS PROVISION**

28. If any of the above-described forfeitable property, as a result of any act or omission of the defendant:

a. cannot be located upon the exercise of due diligence;

b. has been transferred or sold to, or deposited with a third party;

c. has been placed beyond the jurisdiction of the Court;

d. has been substantially diminished in value; or

e. has been commingled with other property which cannot be divided without difficulty;

the United States shall be entitled, pursuant to Title 21, United States Code, Section 853(p) (as incorporated by Title 28, United States Code, Section 2461(c)), to forfeiture of any other property of the defendant up to the value of the above-described forfeitable property.

ROBERT FRAZER
United States Attorney

Matthew J. Belgiovine
Assistant United States Attorney

Approved:

R. David Walk, Jr.
Deputy United States Attorney

CASE NUMBER: 26-CR-177

# United States District Court
# District of New Jersey

**UNITED STATES OF AMERICA**

**v.**

**MORDICHAI WEISS**

# INFORMATION FOR

**18 U.S.C. § 1349**

ROBERT FRAZER
UNITED STATES ATTORNEY
FOR THE DISTRICT OF NEW JERSEY

MATTHEW J. BELGIOVINE
ASSISTANT U.S. ATTORNEY
TRENTON, NEW JERSEY
973.856.9179